## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| DANIEL GILK and SAMUEL GILK, *individually and derivatively on behalf of* FLY BOATWORKS, LLC, | Civil No. 25-2158 (JRT/LIB) |
| Plaintiffs, | |
| v. | **MEMORANDUM OPINION AND ORDER ON MOTIONS FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| MARK FISHER, ERROL GALT, MARK BAKER, and AXOCON POLYMERS, LLC *f/k/a* TRIDENT POLYMERS, LLC, | |
| Defendants. | |

John P. Golbranson, John J. Steffenhagen, Terrance W. Moore, and Thomas Priebe, **HELLMUTH & JOHNSON, PLLC**, 8050 West Seventy-Eighth Street, Edina, MN 55439, for Plaintiffs.

C.J. Schoenwetter and Eric Donald Olson, **BOWMAN & BROOKE LLP**, 150 South Fifth Street, Suite 3000, Minneapolis, MN 55402, for Defendants.

Plaintiffs Daniel Gilk and Samuel Gilk ("Gilks") filed this action individually and on behalf of Fly Boatworks, LLC ("Fly Boatworks") claiming that Defendants Mark Fisher, Errol Galt, Mark Baker, and Axocon Polymers, LLC are actively disclosing Fly Boatworks' trade secrets and usurping Fly Boatworks' business opportunities. Specifically, the Gilks allege that Defendants have conspired to oust Fly Boatworks from a lucrative skiff boat contract with Martac Corp. ("Martac") by inserting

Axocon into that contract.  The Gilks seek a temporary restraining order ("TRO") and preliminary injunction enjoining this conduct.

Defendants also seek a TRO and preliminary injunction because they allege that the Gilks (and their counsel) illegally hacked into Defendant Fisher's email account and stole confidential information, including attorney-client privileged communications.

Because the Gilks have demonstrated a likelihood of success on the merits and irreparable harm, the Court will grant the Gilks' motion for preliminary injunction.  In contrast, because Defendants have demonstrated neither a likelihood of success on the merits nor irreparable harm, the Court will deny Defendants' motion for preliminary injunction.

## BACKGROUND

### I.    FACTS

The Gilks founded Fly Boatworks in 2012 to build and sell skiff boats.  (Am. Compl. ¶ 15, June 10, 2025, Docket No. 40.)  Beginning in 2019, the Gilks began working with Fisher to create a new skiff model, the F2 Carbon.  (*Id.* ¶ 16.)  Over the next two years, the Gilks and Fisher collaborated to develop the F2 Carbon which included inventing ten primary components and the F2 Carbon manufacturing molds.  (*Id.* ¶ 18.)  In 2021, Fisher, Galt, and Baker (collectively, "Individual Defendants") invested in Fly Boatworks and entered into the Fly Boatworks Operating Agreement ("Operating Agreement") with the Gilks.  (*Id.* ¶ 22.)  Pursuant to the Operating Agreement, Daniel Gilk, Samuel Gilk, and

Fisher each own 22.22% of Fly Boatworks, while Galt and Baker each own 16.67%.  (*Id.* ¶ 23.)  The Gilks were responsible for engineering duties.  (*Id.* ¶ 31.)  Fisher conducted development operations and financial management and sales.  (*Id.* ¶ 32.)  Galt and Baker acted as silent investors.  (*Id.* ¶ 33.)

The Gilks concede that Fisher contributed to the development of the F2 Carbon by providing broad visions but maintain that the specific design work was performed by the Gilks.  (*Id.* ¶ 17.)  The Gilks claim to be the primary creators of, among others, "the specific design method which allowed the jet pump integration with the hull . . . , the specifically shaped hull and stern design . . . , the internally-actuated trim tab design[, and] the cap (or deck) assembly . . . ."  (*Id.* ¶ 19.)  The Gilks further contend that their contributions are what make the F2 Carbon a revolutionary product.  (*Id.* ¶ 20.)

Development of the F2 Carbon continued for several years.  By the end of 2022, the first F2 Carbon prototype had been built and initial testing and marketing began.  (*Id.* ¶ 36.)  Over the next two years, the Gilks continued to revise and refine the F2 Carbon.  (*Id.* ¶ 37.)  During that time, the Gilks built and delivered four F2 Carbons to consumers.  (*Id.* ¶ 38.)  Without a means to manufacture the F2 Carbons, the Gilks built each F2 Carbon in house.  (*Id.*)

Fly Boatworks began negotiations with Martac in October 2024.  (*Id.* ¶ 40.)  Fly Boatworks and Martac worked together to integrate the F2 Carbon components into

Martac's M18.[1]  (*Id.* ¶ 43.)  The Gilks allege that they developed and designed all of the new components for the M18.  (*Id.*)

In December 2024, Fisher sent a proposal, on behalf of Fly Boatworks, to Martac offering to "develop, produce, and deliver the best jet-driven Hyper skiff on the market, designed to Martac's specifications." (*Id.* ¶¶ 44–45.)  The M18 product would integrate Martac's unmanned, artificial intelligence, and drone technology and rapidly scale up production utilizing Martac's global and military connections.  (*Id.* ¶ 46.)  The projected profit from this partnership was $23 million annually.  (*Id.* ¶ 51.)

The Gilks allege that when the M18 design was finalized to meet Martac's needs, the Individual Defendants formed Axocon and began negotiating with Martac on behalf of Axocon instead of Fly Boatworks.  (*Id.* ¶¶ 53, 57–58.)  The Gilks allege, however, that Fisher continues to request M18 engineering services from the Gilks.  (*Id.* ¶ 59.)

The Gilks argue that the Individual Defendants have created several businesses to further their theft of Fly Boatworks' business opportunities.  Axocon was formed after Fly Boatworks began negotiations with Martac and is equally owned by all three Individual Defendants.  (*Id.* ¶ 60.)  Fisher created Marine Aerospace Composites LLC ("MASC") allegedly to secure the manufacturing contract with Martac.  (*Id.* ¶ 61; Decl. of Daniel Gilk ("D. Gilk Decl.") ¶¶ 31–32, Ex. H, May 20, 2025, Docket No. 11.)  Galt is believed to own

_____

[1] The products are referred to as both M18 and M19 but are used by the parties interchangeably.  (*See* Compl. ¶ 47.)  For clarity, the Court will exclusively use M18.

Oversight Resources, LLC ("Oversight"), which has received several invoices from MASC related to the construction of the M18 mold. (Am. Compl. ¶ 62; D. Gilk Decl. ¶ 34.)

The Gilks allege significant clandestine behavior by the Individual Defendants to steal Fly Boatworks' business opportunities. Fisher allegedly sent many outstanding bills to Oversight, described paying those bills out of his own pocket to "avoid tracking," and directed payments to personal accounts. (Am. Compl. ¶¶ 63–64, 83–84.) Fisher has also allegedly filed a patent application on behalf of Axocon that names himself, Galt, and Baker as inventors and incorporates the Gilks' and Fly Boatworks' inventions. (*Id.* ¶¶ 65–70.) The Gilks cite to communications about entering into an exclusive contract between Axocon and Martac and removing any Fly Boatworks' branding. (*Id.* ¶¶ 89–95. 96–97.) The Gilks further allege that the Individual Defendants have used Axocon as an alter ego of Fly Boatworks to defraud the Gilks. (*Id.* ¶¶ 105, 112.)

As part of the overall conspiracy, the Gilks allege that the Individual Defendants' conduct intended to force the dissolution of Fly Boatworks. The Gilks cite to a draft email from Galt to Fisher and Baker, intended to be sent to the Gilks, that claims that Fly Boatworks cannot continue operations because it carried too much debt and thus should be dissolved, or the Operating Agreement should be amended. (*Id.* ¶ 74.) Fisher also emailed the Fly Boatworks owners expressing an intent to exit Fly Boatworks and requesting a buyout. (*Id.* ¶ 75.) Galt and Baker then called due Member Loan #4, for which the Gilks and Fisher were personally liable. (*Id.* ¶¶ 85–88.)

Believing that a prototype would be delivered to Martac on May 28, 2025, and a contract would be signed on June 2, 2025, the Gilks initiated this action individually and on behalf of Fly Boatworks. (Compl., May 20, 2025, Docket No. 1.)

## II.    PROCEDURAL HISTORY

The Gilks bring causes of actions against Defendants for misappropriation of trade secrets, breach of contract, breach of fiduciary duties, breach of the covenant of good faith and fair dealing, civil conspiracy, conversion/civil theft, unjust enrichment, accounting, tortious interference with prospective economic advantage and contract, and fraud. (Am. Compl. ¶¶ 118–92.) The Gilks sought immediate injunctive relief through a motion for TRO and preliminary injunction. (Pls.' Mot. for TRO and Prelim. Inj., May 20, 2025, Docket No. 8.)

The Court held a hearing to establish a briefing schedule for the Gilks' TRO motion. (Min. Entry, May 27, 2025, Docket No. 19.) The Court then issued a TRO, largely stipulated to by the parties, to preserve the status quo until the Court could issue an order on the Gilks' pending motion. (TRO, May 29, 2025, Docket No. 20.)

Defendants responded to the Gilks' TRO motion, and Defendants simultaneously filed their own motion for TRO and preliminary injunction, (Defs.' Mem. Opp'n Pls.' Mot. for TRO, Defs.' Mot. for TRO and Prelim. Inj., June 3, 2025, Docket Nos. 22, 26.)

The Gilks then filed an amended verified complaint and a supplemental declaration from Daniel Gilk. (Am. Compl; Suppl. Decl. of Daniel Gilk ("Suppl. D. Gilk Decl."), June 10, 2025, Docket No. 43.)

## DISCUSSION

**I.   STANDARD OF REVIEW**

Courts evaluating a motion for a temporary restraining order or a preliminary injunction weigh four factors, commonly referred to in the Eighth Circuit as the *Dataphase* factors: (1) the movant's likelihood of success on the merits, (2) the threat of irreparable harm to the movant in the absence of relief, (3) the balance between that harm and the harm injunctive relief would cause to the other litigants, and (4) the public interest. *Rodgers v. Bryant*, 942 F.3d 451, 455 (8th Cir. 2019) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)); *S.B. McLaughlin & Co. v. Tudor Oaks Condo. Project*, 877 F.2d 707, 708 (8th Cir. 1989).  "The party seeking injunctive relief bears the burden of proving all the *Dataphase* factors."  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

When applying these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).  That said, injunctive relief is an "extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Watkins*, 346 F.3d at 844 (citations omitted).

## II.    PLAINTIFFS' MOTION FOR TRO AND PRELIMINARY INJUNCTION

The Gilks seek a TRO and preliminary injunction enjoining the Defendants from usurping Fly Boatworks' business opportunities with Martac.  The Gilks bring ten separate causes of action against the Defendants.[2]  In essence, all causes of action hinge on whether or not the Defendants were using the Gilks' and Fly Boatworks' proprietary information for their own financial gain.

Defendants begin by challenging the procedural adequacy of the Gilks' complaint and the evidentiary value of Daniel Gilks' declarations.  To the extent the first complaint was deficient, the Gilks' remedied that deficiency by filing an amended verified complaint as required by Federal Rule of Civil Procedure 23.1.  With respect to Defendants' evidentiary concerns, the Court will address admissibility issues when necessary.  But courts in this Circuit have frequently applied a less strict standard to evidence at this early stage in litigation.  *See Cooke v. Randolph, Neb. City Council*, No. 8:23-249, 2023 WL 6519374, at *2 n.3 (D. Neb. Oct. 5, 2023); *Kohls v. Ellison*, No. 24-3754, 2025 WL 66514, at *2 (D. Minn. Jan. 10, 2025); *see also USA Visionary Concepts, LLC v. MR Int'l, LLC*, No. 4:09-874, 2009 WL 10672094, at *5 (W.D. Mo. Nov. 17, 2009) (finding that the rules of evidence typically are inapplicable in evaluating a preliminary injunction).  So the Court will not exclude Daniel Gilk's declarations for the purposes of this motion.

---

[2] The claims for breach of contract, breach of fiduciary duties, and breach of the covenant of good faith and fair dealing are only against the Individual Defendants because Axocon was not a member of Fly Boatworks.  But that distinction does not impact the analysis here.

### A.    Likelihood of Success on the Merits

Showing likelihood of success on the merits does not require "a mathematical (greater than fifty percent) probability of success on the merits." *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684, 690 (8th Cir. 2003). Rather, the movant needs to show that they have a "fair chance of prevailing." *Id.*

To be successful, the Gilks need to show that their innovations in the F2 Carbon and as integrated into the M18 ("Skiff Innovations") are trade secrets or that the opportunity with Martac continues to belong to Fly Boatworks.[3] At this stage of the case, the Gilks' have shown a likelihood of success on both.

### 1.    Trade Secrets

"A trade secret is information that: (1) is not generally known or readily ascertainable, (2) has value as a result of its secrecy, and (3) is the subject of reasonable efforts under the circumstances to protect its secrecy." *Wyeth v. Nat. Biologics, Inc.*, 395 F.3d 897, 899 (8th Cir. 2005); *see also* 18 U.S.C. § 1839(3).

Defendants concede that the Skiff Innovations could be trade secrets but argue that the Skiff Innovations are generally known or readily ascertainable and that the Gilks did not take reasonable efforts to protect the secrecy of the Skiff Innovations.

---

[3] The Court analyzes Fly Boatworks' opportunity to bring the Skiff Innovations to market under the context of the negotiations with Martac, despite being made aware that the opportunity with Martac may be paused. Any opportunity to bring the Skiff Innovations to market belongs to Fly Boatworks, even if not in partnership with Martac. So the outcome remains the same.

First, the specifics of the F2 Carbon, and particularly its integration into the M18, were unlikely to be generally known or readily ascertainable.  Defendants suggest that because the Gilks' relied on publicly available designs, included specifications of the F2 Carbon on the Fly Boatworks' website, previously sold four F2 Carbons, and shared the specifics with Martac, the Skiff Innovations are generally known or reasonably ascertainable.

But the evidence suggests otherwise.  For one, despite having access to all the specifics, Fisher still appears to be asking the Gilks for M18 engineering services.  (Suppl. D. Gilk Decl. ¶ 11.)   The fact that Fisher may not even be able to reverse engineer the M18 without the Gilks' aid makes it difficult to conclude that someone else, with less information, would be able to recreate the M18 from available information.  Additionally, Chris Morejohn, who Defendants argue created the skiff that the Gilks copied, acknowledged that the Gilks were doing something new.  (*Id.* ¶ 13, Ex. GG at 2 ("What you have done is what I [Chris Morejohn] have been hoping for in sharing my designs and ideas online, something new.").)  An acknowledgement by an expert in the field of the novelty of the Skiff Innovations indicates that the Skiff Innovations are not generally known.  Indeed, Chris Morejohn promised to protect that secrecy.  (*Id.* ("I just want to say here in writing all that you shared with me will not be shown to anyone else unless you say it's ok.").)  Finally, mere negotiations with a potential partner or website descriptions do not render trade secrets unprotectable.  Trade secrets' holders are not bound to

absolute secrecy and may confide in another to "apply [the trade secret] to the uses for which it is intended." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974). Without internet marketing and business negotiations, Fly Boatworks would never have been able to apply the Skiff Innovations to their intended uses. Accordingly, the Gilks' have likely demonstrated that the Skiff Innovations are not generally known or readily ascertainable.

Second, the Gilks likely took reasonable efforts to protect the secrecy of the Skiff Innovations. Despite the fiduciary duties imposed by the Operating Agreement and implied confidentiality, Defendants suggest several other measures the Gilks and Fly Boatworks could have taken. But the fact that more could have been done does not mean that the current measures were inadequate. *See AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011) ("Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required."). It seems entirely reasonable that in a closely held company with only five members, reliance on only fiduciary duties to preserve confidential information would be reasonable. *Id.* (citing *Kewanee Oil Co.*, 416 U.S. at 475 ("[S]ecrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another in confidence, and under an implied obligation not to use or disclose it." (quotation omitted))). The evidence also suggests that even those not bound by fiduciary duties understood the information was shared under implied confidentiality. (*See, e.g.*, Suppl. D. Gilk Decl. ¶ 13, Ex. GG at 2 (email from Chris Morejohn that he intended to keep the information secret unless otherwise advised).)

The Gilks' have demonstrated that Fly Boatworks' efforts to protect the secrecy of the Skiff Innovations were likely reasonable.

Defendants argue that even if the Skiff Innovations are trade secrets, they belong to Fly Boatworks (or Martac) and they have not been pled with sufficient specificity.  First, there is no evidence suggesting the Skiff Innovations belong to Martac, and Defendants provide none other than conclusory statements.  Second, the Gilks acknowledge that the Skiff Innovations belong to Fly Boatworks and seek to protect Fly Boatworks' interest through this derivative action.  Third, though the Gilks may need to identify the Skiff Innovations more specifically to actually prevail, they have provided adequate specificity for the Court to determine the likelihood of success on the merits of their trade secrets claim.

In sum, the Gilks have demonstrated a likelihood of success in showing that the Skiff Innovations are trade secrets.

### 2.    Fly Boatworks' Opportunities

Defendants rely on the Gilks' alleged refusal to use dicyclopentadiene advance polymer composite material and refusal to scale up manufacturing to suggest that the Gilks and Fly Boatworks relinquished those Martac opportunities.  But Defendants present no evidence of the Gilks' refusal, nor why such alleged refusal should be considered a relinquishing of opportunities.  Defendants' clandestine behavior further suggests this was not simply businesspeople identifying available opportunities.  Rather, it appears Defendants identified weaknesses in Fly Boatworks' business operation and

thought they could fulfill the contract with Martac more competently. Defendants' supposed superior vision to meet Martac's needs does not divest Fly Boatworks of their right to the Martac business opportunity. Accordingly, the Gilks have shown that the Martac M18 opportunity likely still belongs to Fly Boatworks.

\* \* \*

In sum, the Gilks have shown a likelihood of success on the only two issues addressing the merits of their claims: that the Skiff Innovations are trade secrets and that Axocon's negotiations with Martac overlap with Fly Boatworks' opportunities. Because the Gilks' have shown a likelihood of success on those two issues, the overall likelihood-of-success-on-the-merits *Dataphase* factor weighs in favor of granting the Gilks' motion for TRO and preliminary injunction.

### B.    Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Phyllis Schlafly Revocable Tr. v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoting *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). The movant must demonstrate that irreparable harm is "*likely* in the absence of an injunction," not merely possible. *Hotchkiss v. Cedar Rapids Cmty. Sch. Dist.*, 115 F.4th 889, 893 (8th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

Because the Skiff Innovations are likely trade secrets and the threat of misappropriation of trade secrets may constitute irreparable harm, *Prime Therapeutics*

*LLC v. Beatty*, 354 F. Supp. 3d 957, 974 (D. Minn. 2018), the Gilks must only show that the misappropriation of the Skiff Innovations is reasonably certain to occur and would cause harm without an inadequate remedy at law, *Gen. Motors Corp.*, 563 F.3d at 319. The Gilks have met their burden here because the Defendants' emails suggest active negotiation with Martac that excludes Fly Boatworks entirely, and the loss of the Martac deal would harm Fly Boatworks' goodwill, reputation, ability to bring Skiff Innovations to market first, and its entire existence.

The harm is reasonably certain to occur absent an injunction. There is email evidence that the Defendants, through Axocon, had plans to deliver a prototype and a projected contract signing date. (D. Gilk Decl. ¶¶ 43, 48, Ex. V, Ex. AA at 9–10.) Despite Defendants' argument that their actions would benefit Fly Boatworks, Fisher sent the email regarding the delivery of the prototype to Martac a week after he requested to be bought out from Fly Boatworks. (*Compare* D. Gilk Decl. ¶ 43, Ex. V (email about prototype sent May 12, 2025), *with* D. Gilk Decl. ¶ 41, Ex. S (email from Fisher expressing intent to leave Fly Boatworks and asking to be bought out sent May 5, 2025).) It is difficult to understand why Fisher would continue to diligently work to deliver a prototype to Martac on behalf of Fly Boatworks when he had already asked to be bought out.[4] Also, the most recent proposed contract was between Axocon and Martac. (D. Gilk Decl. ¶ 47, Ex. Z

---

[4] The Court was made aware at oral argument that the prototype has been delivered to Martac on behalf of Fly Boatworks as required under the TRO, but that does not change the relevance of this information for the pending motions.

("We're truly excited about the partnership between **Axocon Polymers Inc.** and **MARTAC**.").)  In drafting that contract, the Defendants discussed the necessity to remove any Fly Boatworks' branding.  (*Id.*, Ex. AA at 9–10.)  The Gilks have shown that the harm is likely to occur.

And while monetary damages may offset most of the harm to the Gilks and Fly Boatworks, such damages are unlikely to be sufficient on their own.  For example, if Fly Boatworks ended up losing the contract, and Axocon instead made a profit of $25 million annually, courts could redistribute the financial gain to Fly Boatworks.  But the Gilks claim two additional harms that nudge the overall harm into the irreparable category.  First, the Gilks allege that their goodwill and status as an innovator in the market will be irreparably harmed because they will lose their ability to bring the Skiff Innovations to the market first.  Once someone introduces the Skiff Innovations into the market, no other company can be the first to do so.  That harm is difficult to ascertain and difficult to compensate.  *Cf. Paisley Park Enters., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1049 (D. Minn. 2017) (finding irreparable harm if unreleased songs were to be released because once published it permanently deprives the owner of determining when if ever, that information should be released).  Second, the monetary harms threaten the existence of Fly Boatworks— because Defendants may usurp a large contract from Fly Boatworks, just as Fisher is requesting to be bought out and Member Loan #4 has been called due.  Such an existential threat to the company is sufficient to constitute irreparable harm.  *Packard Elevator v.*

*I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986).  The Gilks have shown that monetary damages are insufficient to remedy the harms.

In conclusion, the Gilks have shown a threat of irreparable harm which weighs in favor of the Court entering a preliminary injunction.

**C.    Balance of Harms**

The Gilks and Fly Boatworks face imminent harm to their reputation and to the continued existence of their company.  Defendants argue that if the Court grants the Gilks' motion, Fisher will be unable to work on behalf of Fly Boatworks, the Martac deal will not materialize, and the Individual Defendants, as majority owners in Fly Boatworks, will be substantially harmed.  Defendants also argue that Galt and Baker will be precluded from asserting their contractual rights to call Member Loan #4 due, and Axocon may be unable to protect its intellectual property if the Court enjoins the patent application.

Almost all of Defendants' purported harm is not in fact harm at all, with the potential exception of the repayment of Member Loan #4.  First, the Gilks' motion does not seek any relief regarding Axocon's provisional patent, it simply uses that as evidence. Second, Defendants argue that the relief requested by the Gilks would "freeze out" Fisher. But Fisher has already requested that the other Fly Boatworks' members buy him out. Third, the relief requested does not prohibit continued negotiations and contracting with Martac; it simply requires that conduct to be on behalf of Fly Boatworks.   Thus, it is unclear how Fly Boatworks, and the Individual Defendants through their investments, would suffer any harm if the Court grants the Gilks' motion.  Finally, though the Court has

considered that the injunction would prevent Galt and Baker from collecting on their payment from Member Loan #4, the Gilks nevertheless dispute the right to call Member Loan #4 due at all, claiming that Galt and Baker breached the Operating Agreement first.

Because the only harm adequately argued by Defendants, the inability to collect on Member Loan #4, can easily be remedied through monetary damages, and the Gilks and Fly Boatworks face significant harm without adequate remedy at law, the balance of harms factor weighs in favor of granting the Gilks' motion.

### D.    Public Interest

Along with rehashing likelihood of success and threat of irreparable harm arguments, Defendants rely on the interest the public has in enforcing contracts. The public interest in the enforcement of contracts is certainly important, *Kato Eng'g, Inc. v. Hanley*, 367 F. Supp. 3d 918, 924 (D. Minn. 2018) (citing *Cherne Indus., Inc. v. Grounds & Assoc., Inc.*, 278 N.W.2d 81, 94 (Minn. 1979)), but that interest is not in jeopardy through the issuance of this preliminary injunction. In fact, because the Gilks argue that Galt and Baker may be prohibited from recovering Member Loan #4 if they breached the Operating Agreement first, the public interest of judicial enforcement of contracts is served by a preliminary injunction because it will allow the Court to evaluate the merits more thoroughly. Additionally, the public interest of protecting a company's goodwill, reputation, and trade secrets, *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 456 (Minn. Ct. App. 2001), is served through a preliminary injunction. So, the public interest *Dataphase* factor supports granting the Gilks' motion for preliminary injunction.

*   *   *

In conclusion, all four *Dataphase* factors weigh in favor of granting the Gilks' motion for preliminary injunction, so the Court will enter a preliminary injunction that aligns with the TRO already in place.

### E.    Bond

If the Court enters a preliminary injunction, Defendants request two bonds: one somewhere between $12,778,800.00 and $25,557,600.00 to protect the Defendants' personal investments in Fly Boatworks and one for $25 million to protect Axocon's patent opportunity.  Typically, courts require security "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  Because the preliminary injunction will not enjoin Axocon's patent activity, there are no potential damages to protect against.  With respect to protection for the Defendants' share of Fly Boatworks, a bond is also not required.  Fly Boatworks is an entity owned by both sides, so both sides share the risk.  Further, the preliminary injunction, like the TRO, will allow for continued business on behalf of Fly Boatworks.  Accordingly, the Court will not require a bond at this time.

## III.    DEFENDANTS' MOTION FOR TRO AND PRELIMINARY INJUNCTION

Defendants seek a TRO and preliminary injunction requiring that the Gilks stop accessing emails from the flyboatworksjet@gmail.com[5] email address, identify and delete emails already obtained, and be prohibited from using the emails already obtained to further their litigation position.    Primarily though, Defendants seek a complete prohibition on the use of everything obtained from the emails for the pendency of this litigation.    Defendants allege that the Gilks stole the confidential emails from Fisher's personal email account in violation of the Electronic Communications Privacy Act ("ECPA"), Stored Communications Act ("SCA"), Minnesota's civil theft statute, and common law privacy rights.

### A.    Likelihood of Success on the Merits

Defendants' likelihood of success on their claims depends primarily on whether the Gilks' access to the flyboatworksjet@gmail.com email was authorized.[6]

---

[5] The parties use both flyboatworksjet@gmail.com and flyboatworksjets@gmail.com, but because the exhibits indicate flyboatworksjet@gmail.com is the correct email address, the Court will use that variation.

[6] ECPA does not make an interception unlawful when a party to the communication has consented to its interception.  18 U.S.C. § 2511(2)(c).  The SCA provides a cause of action when one "intentionally accesses without authorization" or "intentionally exceeds an authorization" to stored communications.  18 U.S.C. § 2701(a).  Civil theft requires "steal[ing]" of personal property.  Minn. Stat. § 604.14, subd. 1. "Courts rely on the criminal theft statute to determine whether a defendant's conduct amounted to theft."  *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1076 (D. Minn. 2013).  The Minnesota criminal theft statute defines theft as "intentionally and without claim of right takes [or] uses . . . property of another without the other's consent."  Minn. Stat. § 609.52, subd. 2(a)(1).  Intrusion upon seclusion requires an "intrusion."  *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. Ct. App. 2001).  To intrude means "to thrust oneself

Fisher maintains that the flyboatworksjet@gmail.com strictly served as a personal email address.  The record does provide some support for that contention.  For example, the Gilks do not contest that Fisher registered for the email and did so eight months before he became a part owner in Fly Boatworks.  Furthermore, it appears as though Fisher paid for additional storage for the flyboatworksjet@gmail.com email out of his own pocket.  Finally, Fisher clearly used this email address for very personal matters.

However, other evidence in the record tilts toward this email being Fly Boatworks' email.  Starting with the actual email address, flyboatworksjet@gmail.com suggests a corporate account instead of a personal account.  Generally, people would expect some identifying feature in a personal email, such as the person's name or potentially an interest, but few would see this email address and assume it belonged to an individual. Additionally, any inquiries submitted on the website, which were just generally outreach inquiries, were forwarded to this email address.  Finally, Fisher shared account information with the Gilks.  And while the Court cannot confirm the particular reason that information was shared, there is evidence that the password was shared with the Gilks.

In sum, Defendants have not shown that they are likely to succeed in showing that the Gilks' access to the flyboatworksjet@gmail.com email was unauthorized, and because

in without invitation, permission, or welcome." *Intrude*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/intrude (last visited June 24, 2025).

that is the bedrock to all of Defendants' claims, this factor weighs in favor of denying Defendants' motion for preliminary injunction.

### B.    Irreparable Harm

Defendants have also failed to meet their burden in showing irreparable harm. Defendants primarily cite to privacy rights and litigation disadvantage.  If the Gilks' access to the email account was authorized, as likely shown above, Defendants have not shown any harm.  Even if the access was unauthorized, Fisher has since changed the password, so there appears to be no ongoing threat of harm, and past injury is insufficient.  *Miller v. Honkamp Krueger Finances*, 9 F.4th 1011, 1015 n.3 (8th Cir. 2021).  Defendants have failed to meet their burden to show a threat of irreparable harm to their privacy.

Regarding the litigation disadvantage, the Court takes seriously the necessity to preserve the legitimacy of the discovery process.  So, although it will not categorically exclude the evidence the Gilks' obtained from the flyboatworksjet@gmail.com email, the Court will order the Gilks to disclose all documents they obtained from that email within fourteen days of the date of this order.  If necessary, Defendants may challenge the admissibility and privilege status of these documents at a later stage. If inadmissible, Plaintiffs will not be permitted to rely on such emails.

Because Defendants have failed to show irreparable harm, this factor weighs against granting Defendants' motion for a preliminary injunction.

### C.    Balance of Harms

Defendants have not shown a threat of irreparable harm, where the Gilks are likely to suffer from an inability to present legitimate legal claims and an evidentiary windfall to Defendants.  This factor weighs against granting Defendants' motion for a preliminary injunction.

### D.    Public Interest

Defendants argue that the public has an interest in protecting privacy and preventing unlawful conduct.  While true, the public also has an interest in preventing the theft of trade secrets and other confidential business information.  Neither party presents strong public interest arguments here.  But if the Court granted the Defendants' motion for TRO and preliminary injunction, the Gilks would be prohibited from using all the information in Fisher's email and that would prevent the Court from issuing a merits decision on the trade secrets issue.  The public interest factor weighs slightly in favor of denying Defendants' motion for preliminary injunction.

*       *       *

Because all four *Dataphase* factors weigh against granting Defendants' motion for TRO and preliminary injunction, the Court will deny Defendants' motion.  However, to ensure fairness throughout this litigation, the Gilks will be ordered to disclose a list of the documents obtained and the Defendants remain free to challenge the admissibility and privilege status of those documents at a later stage in the litigation.

-22-

**CONCLUSION**

The Gilks began Fly Boatworks to design skiff boats and brought in Fisher, Galt, and Baker as investors. Fly Boatworks was progressing well, even negotiating a potentially lucrative deal with Martac. Then, the relationship between the members disintegrated, and litigation over the Skiff Innovations ensued. Both parties moved for immediate injunctive relief. Because the *Dataphase* factors favor the Gilks' motion, the Court will enter a preliminary injunction with the same terms as the active TRO. The Court will not require a bond. Because the *Dataphase* factors weigh against the Defendants' motion, the Court will deny Defendants' motion for TRO and preliminary injunction. The Court will, however, require the Gilks to identify all of the documents obtained from the flyboatworksjet@gmail.com email address. The Court encourages the parties to explore settlement options in order to allow further development of the invention.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction [Docket No. 8] is **GRANTED** and the Court enters the following Preliminary Injunction**:**

   a. Daniel Gilk, Samuel Gilk, Mark Fisher, Errol Galt, Mark Baker and Axocon Polymer, LLC (the "Parties") are prohibited from misappropriating, stealing, and otherwise using Fly Boatworks, LLC's trade secrets, designs,

innovations, and inventions, including the F2 Carbon for any purpose other than for the benefit, and in the best interests, of Fly Boatworks, LLC. All uses of Fly Boatworks, LLC's trade secrets and all Fly Boatworks, LLC opportunities may only be undertaken pursuant to the terms of Fly Boatworks, LLC's Operating Agreement, including but not limited to Article IX.

b. The Parties are prohibited from entering into contracts or business opportunities that belong to Fly Boatworks, LLC. All contracts and business opportunities may only be undertaken by the Parties for the benefit of Fly Boatworks, LLC pursuant to the terms of its Operating Agreement, including but not limited to Article IX.

c. The Parties are prohibited from delivering a prototype of Fly Boatworks, LLC's product(s) to any other persons or entities except on behalf of Fly Boatworks, LLC, and with prior consent from all Parties.

d. The Parties are prohibited from sending any of Fly Boatworks, LLC's designs, specifications, and plans to any other persons or entities except on behalf of Fly Boatworks, LLC, and with prior consent from all Parties.

e. Any payments under "Member Loan #4" (as that loan is defined by Fly Boatworks, LLC's Operating Agreement, including Addendum # 1) are hereby stayed.

f.  All actions taken by the Parties related to the business and/or trade secrets of Fly Boatworks, LLC, including but not limited to, the F2 Carbon, M18, M19, skiffs, prototypes, boats, designs, contracts, payments, deliveries, agreements, or Martac will be taken for the sole benefit of Fly Boatworks, LLC.

g.  No part of the stipulation that served as the partial basis for the Temporary Restraining Order shall be used as evidence (or otherwise) for or against any Party concerning the merits of their respective claims and defenses, and that the entering of the Temporary Restraining Order (and the parties' stipulations and negotiation thereof) will not be used to prejudice the rights of any Party other than as expressly stated in the parties' stipulation.

2.  Defendants' Motion for Temporary Restraining Order and Preliminary Injunction [Docket No. 26] is **DENIED**.

3.  Plaintiffs will identify all documents and messages obtained from the flyboatworksjet@gmail.com email within fourteen (14) days of this order.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  July 11, 2025                                    ___s/John R. Tunheim___
at Minneapolis, Minnesota.                               JOHN R. TUNHEIM
                                                         United States District Judge