UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

DANIEL GILK and SAMUEL GILK, *each individually and derivatively on behalf of* FLY BOATWORKS, LLC,

Plaintiffs,

v.

MARK L. FISHER,

ERROL GALT,

MARK BAKER, and

AXOCON POLYMERS, LLC, *formerly known as* TRIDENT POLYMERS, LLC,

Defendants.

Civil No. 25-2158 (JRT/LIB)

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**

---

John P. Golbranson, John J. Steffenhagen, Terrance W. Moore, and Thomas Priebe, **HELLMUTH & JOHNSON, PLLC**, 8050 West Seventy-Eighth Street, Edina, MN 55439, for Plaintiffs.

Matthew T. Collins and Nicholas M. Lewis, **FABYANSKE, WESTRA, HART & THOMSON, PA**, 80 South Eighth Street, Suite 1900, Minneapolis, MN 55402; for Defendants Mark L. Fisher, Errol Galt, and Mark Baker; and Elena Senftner, **FABYANSKE, WESTRA, HART & THOMSON, PA**, 80 South Eighth Street, Suite 1900, Minneapolis, MN 55402, for Defendant Axocon Polymers.

Plaintiffs Daniel Gilk and Samuel Gilk (the "Gilks") filed this action individually and on behalf of Fly Boatworks, LLC ("Fly Boatworks," together with the Gilks, "Plaintiffs") claiming, among other things, that Defendants Mark L. Fisher, Errol Galt, Mark Baker, and

Axocon Polymers, LLC (collectively, "Defendants") misappropriated Fly Boatworks' trade secrets and usurped Fly Boatworks' business opportunities.  Specifically, the Gilks allege that Defendants have conspired to oust Fly Boatworks from a lucrative skiff boat contract with Martac Corp. ("Martac") by inserting Axocon into that contract.  Plaintiffs bring claims against the Defendants for misappropriation of trade secrets, breach of contract, breach of fiduciary duties, breach of the covenant of good faith and fair dealing, civil conspiracy, conversion/civil theft, unjust enrichment, accounting, tortious interference with prospective economic advantage and contract, fraud, and injunctive relief. Defendants now move to dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  After careful consideration, the Court will **GRANT in part and DENY in part** Defendants' motion to dismiss.

## BACKGROUND

### I.    FACTUAL BACKGROUND

The Gilks founded Fly Boatworks in 2012 to build and sell skiffs.  (Am. Compl. ¶ 15, June 10, 2025, Docket No. 40.)  Beginning in 2019, the Gilks began working with Fisher to create a new skiff model, the F2 Carbon.  (*Id.* ¶ 16.)  Over the next two years, the Gilks and Fisher collaborated to develop the F2 Carbon, which included inventing ten primary components and the F2 Carbon manufacturing molds.  (*Id.* ¶ 18.)  In 2021, Fisher, Galt, and Baker (collectively, "Individual Defendants") invested along with the Gilks in Fly Boatworks, entering into the Fly Boatworks Operating Agreement ("Operating Agreement").  (*Id.* ¶ 22.)  Under the Operating Agreement, Daniel Gilk, Samuel Gilk, and

Fisher each owned 22.22% of Fly Boatworks, and Galt and Baker each owned 16.67% of Fly Boatworks. (*Id.* ¶ 23.)  But the Operating Agreement required all company actions be approved by a unanimous vote of all owners and imposed a duty of loyalty. (*Id.* ¶¶ 25–27.)  The Gilks were responsible for engineering duties. (*Id.* ¶ 31.)  Fisher oversaw development operations, financial management, and sales. (*Id.* ¶ 32.)  Galt and Baker acted as silent investors. (*Id.* ¶ 33.)

The Gilks concede that Fisher contributed to the development of the F2 carbon by "provid[ing] a broad vision" but maintain that the specific design work was performed by the Gilks. (*Id.* ¶ 17.)  The Gilks claim to be the primary creators of, among other things, "the specific design method which allowed the jet pump integration with the hull[,] . . . the specifically shaped hull and stern design[,] . . . the internally-actuated trim tab design [, and] . . . the cap (or deck) assembly[.]"[1] (*Id.* ¶ 19 (collectively, the "Skiff Innovations").)

---

[1] The "Skiff Innovations" include:

> (1) the specific design method which allowed the jet pump integration with the hull.  The new method made it possible to utilize previously incompatible off-the-shelf high performance jet pump components (with a high dead rise, or sharper hull bottom) with a shallow-water capable hull design (with lower dead rise, or flatter hull bottom).  A specific geometry was developed to transition and combine these elements into a unified, high-performance system; (2) the specifically shaped hull and stern design which provides the F2 Carbon's exceptional low speed maneuverability, reverse, and braking/stopping performance.  Obtaining performance in these areas has typically been a challenge, and the unique innovation solving this involves a stern design with a relatively high degree of curvature (approximately 90 degrees) which allows reverse flow from the jet bucket to be, not

The Gilks further contend that their contributions are what make the F2 Carbon a "revolutionary product." (*Id.* ¶ 20.)

Development of the F2 Carbon continued for several years. By the end of 2022, the first F2 Carbon prototype had been built and initial testing and marketing began. (*Id.* ¶ 36.) Over the next two years, the Gilks continued to revise and refine the F2 Carbon. (*Id.* ¶ 37.) During that time, the Gilks also built and delivered four F2 Carbons to consumers. (*Id.* ¶ 38.) Without a third-party means to manufacture the F2 Carbons, the Gilks built each F2 Carbon in house. (*Id.*)

In October 2024, Fly Boatworks began negotiating with Martac about a possible collaboration. (*Id.* ¶ 40.) Fly Boatworks and Martac worked together to integrate the F2 Carbon components into Martac's M18.[2] (*Id.* ¶ 43.) The Gilks allege that they developed and designed all of the new components for the M18. (*Id.*)

---

only uninhibited, but actually enhanced via the venturi effect created through its interaction with the outside stern angles; (3) the internally-actuated trim tab design; (4) the cap (or deck) assembly, including unique overall design topology as well as specially designed multi-drain-angle gutter systems which promote and direct progressively increasing waterflow for self-bailing evacuation.

(Am. Compl. ¶ 19; *see also* Decl. of Daniel Gilk ("D. Gilk Decl.") ¶¶ 9–10, May 20, 2025, Docket No. 11.)

[2] The products are referred to both as M18 and M19 but are used by the parties interchangeably. (*See* Am. Compl. ¶ 47.) For clarity, the Court will exclusively use M18.

In December 2024, Fisher sent a proposal, on behalf of Fly Boatworks, to Martac offering to "develop, produce, and deliver the best jet-driven Hyper skiff on the market, designed to Martac's specifications." (*Id.* ¶¶ 44–45.)  The M18 product would integrate Martac's unmanned, artificial intelligence, and drone technology and rapidly scale up production utilizing Martac's global and military connections. (*Id.* ¶ 46.)  The projected profit from this partnership was $23 million annually.  (*Id.* ¶ 51.)

The Gilks allege that when the M18 design was finalized to meet Martac's needs, the Individual Defendants (Fisher, Galt, and Baker) formed Axocon and began negotiating with Martac on behalf of Axocon, excluding Fly Boatworks.  (*Id.* ¶¶ 53, 57–58.)  The Gilks allege, however, that Fisher continued to request M18 engineering services from the Gilks.  (*Id.* ¶ 59.)

The Gilks argue that the Individual Defendants have created several businesses to carry out this alleged conspiracy.  Axocon was formed after Fly Boatworks began negotiations with Martac and is equally owned by all three Individual Defendants.  (*Id.* ¶ 60.)  Fisher created Marine Aerospace Composites LLC ("MASC") to allegedly secure the manufacturing contract with Martac.  (*Id.* ¶ 61; Decl. of Daniel Gilk ("D. Gilk Decl.") ¶¶ 31–32, Ex. H, May 20, 2025, Docket No. 11.[3])  Galt is believed to own Oversight Resources,

---

[3] The parties do not dispute that Daniel Gilks' Declaration is necessarily embraced by the First Amended Complaint.

LLC ("Oversight"), which has received several invoices from MASC related to the construction of the M18 mold.  (Am. Compl. ¶ 62; D. Gilk Decl. ¶ 34.)

The Gilks allege significant clandestine behavior by the Individual Defendants to steal Fly Boatworks' opportunities.  Fisher allegedly sent many outstanding bills related to the M18 project to Oversight and described paying those bills out of his own pocket to "avoid tracking" and has directed payments to personal accounts.  (Am. Compl. ¶¶ 63–64, 83–84.)  Fisher has allegedly filed a patent application on behalf of Axocon that names himself, Galt and Baker as inventors and incorporates the Gilks and Fly Boatworks' inventions.  (*Id.* ¶¶ 65–70.)  The Gilks allege that the Individual Defendants conspired to put an exclusive contract in place between Axocon and Martac and removing any Fly Boatworks' branding.  (*Id.* ¶¶ 89–95, 96–97.)  The Gilks further allege that the Individual Defendants have used Axocon as an alter ego of Fly Boatworks in an attempt to defraud the Gilks.  (*Id.* ¶¶ 105, 112.)

As part of the overall conspiracy, the Gilks allege that the Individual Defendants' conduct in early May 2025 was intended to force the dissolution of Fly Boatworks.  The Gilks cite to a draft email sent by Galt to Fisher and Baker, intended to later be sent to the Gilks, that claims that Fly Boatworks cannot continue operations because it carried too much debt and thus should be dissolved or that the Operating Agreement should be amended.  (*Id.* ¶ 74.)  Fisher also emailed the Fly Boatworks owners expressing an intent

to exit Fly Boatworks and requested a buyout.  (*Id.* ¶ 75.)  Galt and Baker then called due

Member Loan #4 which the Gilks and Fisher were personally liable for.  (*Id.* ¶¶ 85–88.)

On May 12, 2025, Fisher sent a "Strategic Partnership Proposal" to The Indoor Lab

("Indoor Lab") on behalf of Axocon.  (*Id.* ¶ 91).  Fisher believed that Axocon and Indoor

Lab's partnership was essential to securing contracts with the Department of Homeland

Security and Customs and Border Protection and was a prelude to an Axocon–Martac

partnership.  (*Id.* ¶¶ 79–80.)  The May 12, 2025 proposal provided that Axocon would be

the exclusive manufacturer for certain vessels and requested that an agreement be made

giving Axocon a right of first refusal to produce any Martac vessels.  (*Id.* ¶ 92.)

On May 14, 2025, Fisher (on behalf of Axocon) accepted an offer from Martac.  (*Id.*

¶ 93.)  When Galt and Baker reviewed the draft agreement with Martac, Baker asked why

they were "co-branding the document with Fly [Boatworks]."  (*Id.* ¶ 96.)  Fisher agreed

that Fly Boatworks' brand "need[ed] to be taken off."  (*Id.*)

Believing that a prototype would be delivered to Martac on May 28, 2025, and a

contract was set to be signed on June 2, 2025 (*id.* ¶¶ 89, 94), the Gilks initiated this action

individually and on behalf of Fly Boatworks on May 20, 2025 (Docket No. 1).

## II.    PROCEDURAL HISTORY

Plaintiffs bring causes of actions against Defendants for misappropriation of trade

secrets, breach of contract, breach of fiduciary duties, breach of the covenant of good

faith and fair dealing, civil conspiracy, conversion/civil theft, unjust enrichment,

accounting, tortious interference with prospective economic advantage and contract,

fraud, and injunctive relief.  (Am. Compl. ¶¶ 118–196.)  The Gilks sought a temporary restraining order (TRO) and preliminary injunction.  (Pls.' Mot. for TRO and Prelim. Inj., May 20, 2025, Docket No. 8.)

The parties stipulated in part to a TRO on May 29, 2025.  (Docket No. 20.) Defendants then responded to the Plaintiffs' TRO motion and simultaneously filed their own motion for TRO and preliminary injunction.  (Defs.' Mem. Opp'n Pls.' Mot. for TRO, June 3, 2025, Docket No. 22; Defs.' Mot. for TRO and Prelim. Inj., June 3, 2025, Docket No. 26.)  While the Court was considering the parties' TRO motions, Plaintiffs amended their complaint (Am. Compl., June 10, 2025, Docket No. 40), and Defendants subsequently moved the Court to dismiss the First Amended Complaint (the "Complaint) under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6) (Defs.' Mot. to Dismiss, June 24, 2025, Docket No. 53).

On July 11, 2025, the Court granted Plaintiffs' TRO motion and denied Defendants' TRO motion.  *Gilk v. Fisher*, Civ. No. 25-2158, 2025 WL 1920496, at *9–10 (D. Minn. July 11, 2025).  In general, the Court preliminarily enjoined the parties from, among other things (1) misappropriating, stealing, or using Fly Boatworks' trade secrets, designs, innovations, and inventions for any purpose other than for Fly Boatworks' benefit; (2) entering into contracts and business opportunities belonging to Fly Boatworks; (3) delivering a prototype of Fly Boatworks to anyone, except on behalf of Fly Boatworks and with prior consent; and (4) sending Fly Boatworks' designs, specifications, and plans to

anyone, except on behalf of Fly Boatworks and with prior consent. *Id.* The Court also stayed any payments under "Member Loan #4." *Id.* at *10.

**DISCUSSION**

**I.    STANDARD OF REVIEW**

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the Complaint as true to determine if the Complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The Court construes the complaint in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although the Court accepts the complaint's factual allegations as true, it is "not bound to accept as true a legal conclusion couched as a factual allegation[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

At the motion to dismiss stage, the Court may consider the allegations in the complaint as well as "those materials that are necessarily embraced by the pleadings." *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014). The Court may also consider matters of public record and exhibits attached to the pleadings, as long as those

documents do not conflict with the complaint. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).[4]

The Court will address the grounds raised in Defendants' motion to dismiss by first considering the general pleading requirements under Rule 8, as well as the specific pleading requirements for derivative actions under Rule 23 and for pleading fraud with particularity under Rule 9(b). It will then turn to Defendants' argument that Plaintiffs have failed to state a claim under Rule 12(b)(6).

---

[4] As a threshold matter, the parties dispute which documents the Court may consider when evaluating Defendants' motion to dismiss. Defendants argue that the Court may consider all records filed connection with the parties' TRO motions—including Fisher's declaration filed in opposition to Plaintiffs' TRO motion (Docket No. 23) and his declaration in support of Defendants' TRO motion (Docket No. 50)—because such documents are public records. In response, Plaintiffs argue that the Court should not consider Fisher's declaration (Docket No. 23) or his supplemental declaration (Docket No. 50). After careful review of the parties' arguments, the Court concludes that it **will** consider the documents at issue because they are either part of the public record, embraced by the complaint, or do not contradict the complaint. *See Porous Media*, 186 F.3d at 1079. The Court also rejects Defendants' argument that it cannot consider materials that rely on information derived from Fisher's email account because Plaintiffs allegedly unlawfully obtained Fisher's emails in violation of the Electronic Communications Privacy Act (18 U.S.C. § 2515) and the Minnesota Privacy in Communications Act (Minn. Stat. § 626A.04). Defendants presented the same or similar argument in support of their TRO motion, and Court rejected it. *Gilk*, 2025 WL 1920496, at *8. The Court will reject Defendants' argument again here because the record does not support the claim that Plaintiffs stole information from the email account. Instead, the record indicates that the account was a company email address, not Fisher's personal email. Fisher's email address, flyboatworksjet@gmail.com, appears to be a corporate account; customer inquiries were automatically forwarded to it; and Fisher shared the account's login credentials with the Gilks. (Suppl. Decl. of Daniel Gilk ("Suppl. D. Gilk Decl.") ¶¶ 5–7, June 10, 2025, Docket No. 43.) Although the Court may consider the documents at issue—including Defendants' submissions—it must still construe the allegations in the light most favorable to Plaintiffs and draw all reasonable inferences in their favor. *See Ashley Cnty.*, 553 F.3d at 665. The Court's conclusions on this threshold issue do not affect its analysis in this Order.

## II.    RULE 8—PLEADING REQUIREMENTS

Defendants argue that Plaintiffs' Complaint must be dismissed because Plaintiffs filed a shotgun complaint that improperly engages in group pleading in violation of Rule 8.[5]  Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  Courts have repeatedly admonished parties for filing "kitchen-sink" or "shotgun" complaints— pleadings that assert "every conceivable claim against every conceivable defendant."  *See, e.g.*, *Gurman v. Metro Hous. & Redevelopment. Auth.*, 842 F. Supp. 2d 1151, 1153, 1153 n.2 (D. Minn. 2011) (collecting cases).  A complaint that "lumps all defendants together" violates Rule 8 because "it does not provide fair notice" of the allegedly offending conduct to each defendant.  *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012).  A complaint must specify which claims are asserted against which defendant; it must plausibly allege "who did what to whom."  *Id.*

The Court concludes that the Complaint does not violate Rule 8.  The flaw in Defendants' argument is that they isolate the Complaint's count section and disregard the Complaint's extensive factual allegations spanning 102 paragraphs.  (*See* Am. Compl. ¶¶ 15–117 (providing factual allegations).)  The Court's task is to assess the plausibility of the claims by considering the Complaint as a whole.  *Cf. Matrixx Initiatives, Inc. v.*

---

[5] The Court will note that Defendants counter Plaintiffs' supposed shotgun Complaint by filing their own shotgun-style motion to dismiss.

*Siracusano*, 563 U.S. 27, 47 (2011). When read in that manner, the Complaint adequately describes each defendant's conduct supporting the asserted causes of action.

The Complaint here specifies which counts apply to which defendants. Although Plaintiffs do not name each defendant individually for every count, they define groups of defendants. The "Defendants" include Fisher, Galt, Baker, and Axocon. (Am. Compl. at 1.) The "Individual Defendants" include Fisher, Galt, and Baker. (*Id.* ¶ 2.) Plaintiffs then plead each count based on the alleged involvement of each defendant with respect to that claim. Defendants can be referred to collectively, provided that the complaint includes sufficient factual allegations identifying each defendant's personal participation. *See, e.g.*, 4 Cyc. of Federal Proc. § 14:210 (3d ed.). Plaintiffs provide such specific factual allegations; they do not rely solely on collective references without attributing any specific conduct to an individual defendant.

Defendants also challenge Plaintiffs' practice of incorporating preceding allegations by reference in each cause of action. The Complaint contains 102 paragraphs of factual allegations followed by eleven causes of action. Although each count incorporates the prior paragraphs, each count sufficiently states the basis for relief under its respective legal theory, providing Defendants with sufficient notice of the conduct for which Plaintiffs seek to hold them liable.[6]

---

[6] *See, e.g.*, *Matheson Tri–Gas, Inc. v. Sheehan*, Civ. No. 11-401, 2011 WL 1832708, at *2 (M.D. Fla. May 13, 2011) (finding that "although each count incorporates by reference each factual allegation and each allegation of every preceding count, the complaint falls exceedingly

-12-

The Court declines to dismiss Plaintiffs' Complaint on the grounds that they improperly engaged in group pleading in violation of Rule 8.

## III.   RULE 23.1—DERIVATIVE ACTION REQUIREMENTS

Defendants argue that Plaintiffs' derivative claims must be dismissed because they fail to satisfy the particularity requirement of Federal Rule of Civil Procedure 23.1.  When a shareholder initiates a derivative action, the shareholder must satisfy Federal of Civil Procedure 23.1's pleading requirements, "which incorporate a threshold issue of substantive state law, the sufficiency of demand or excuse."  *Cottrell v. Duke*, 737 F.3d 1238, 1247 (8th Cir. 2013).  Under Rule 23.1, the plaintiff must file a verified complaint, which must state, with particularity "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).  "Although Rule 23.1 contemplates both the demand requirement and the possibility that demand may be excused, it does not create a demand requirement of any particular dimension."  *Gomes v. Am. Century Co., Inc.*, 710 F.3d 811, 815 (8th Cir. 2013) (citation and internal quotation marks omitted).   If a

---

short of a shotgun pleading" because it "alleges discrete claims in separate counts and distinguishes among the three defendants" (internal quotation marks omitted)); *Chin v. DaimlerChrysler Corp.*, Civ. No. 95-5569, 2005 WL 5121812, at *2 (D.N.J. Dec. 5, 2005) (explaining that "broad incorporation by reference" of all prior allegations did not result in "neutralization of a clear and specific characterization of the action" and that "[i]ncorporation by reference of all preceding allegations is such a common pleading technique that the Court does not feel comfortable in affording it the substantive significance that defendants seek[]").

shareholder does not make a pre-suit demand, the "court must apply state law to determine whether demand is excused." *Id.* The Court therefore must evaluate whether the demand is excused under Minnesota law.

Upon careful consideration, the Court concludes that the Complaint satisfies Rule 23.1. Under Minn. Stat. § 322C.0902, an LLC member may initiate a derivative action to enforce a limited liability company's rights. But the member may do so only if (1) the member makes a demand on the other members, and the other members do not bring the claim with a reasonable time, or (2) the demand would be futile. Minn. Stat. § 322C.0902. The Complaint provides the following:

> To the extent any claim herein is derivative under Minn. Stat. 322C.0901,[7] demand on Fly Boatworks to address the claim would be futile because the Individual Defendants own 55.6% of Fly Boatworks and would not be willing to bring these claims against themselves or their other company, Axocon. Additionally, on May 20, 2025, the Gilks sent a letter to Defendants outlining the allegations contained herein. To date, Defendants have not replied to the Gilks' demands.

(Am. Compl. ¶ 117.)

Here, the Complaint sufficiently alleges that pre-suit demand would be futile. The Complaint alleges that the Individual Defendants own 55.6% of the company, which is sufficient to allege futility. *See, e.g.*, *Novak v. Miller*, No. A22-1164, 2023 WL 2847207, at

---

[7] Although the Complaint cites to Minn. Stat. § 322C.0901 (Direct Action By Member), it is clear from the context that Plaintiffs intended to cite to Minn. Stat. § 322C.0902 (Derivative Action).

*3 (Minn. Ct. App. Apr. 10, 2023) (concluding that complaint alleged futility under Minn. Stat. § 322C.0902 when defendant owned 50% of the company); *Winter v. Farmers Educ. & Co-op. Union of Am.,* 107 N.W.2d 226, 227 (Minn. 1961) ("Ordinarily demand should be made on the board of directors unless the wrongdoers constitute a majority of the board[.]"). Moreover, the futility of demand is underscored by the terms of the Operating Agreement, which requires **unanimous** owner approval for the company to act. (Am. Compl. ¶ 25.) The probability that the Gilks could have obtained the consent of the other three defendant shareholders—indeed, even one of them—to pursue an action was effectively zero.

Accordingly, the Court rejects Defendants' argument that the Complaint fails to satisfy Rule 23.1's pleading requirements, and the Court will deny the Defendants' request for further briefing regarding Rule 23.1's pleading requirements.

## IV.    RULE 9(B)—COUNT 10: FRAUD

Defendants contend that Plaintiffs' fraud claim must be dismissed because Plaintiffs fail to allege fraud with particularity under Rule 9(b).

Claims that sound in fraud are subject to heightened pleading standards under Rule 9(b), and "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Defendants must be able to "respond specifically, at an early stage of the case, to potentially damaging allegations of immoral and criminal conduct." *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001). "Where multiple defendants are asked to respond to allegations of fraud, the complaint should

inform each defendant of the nature of his alleged participation in the fraud." *Streambend Props. II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015) (quoting *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987)). In other words, "the complaint must identify the 'who, what, where, when, and how' of the alleged fraud." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 556 (8th Cir. 2006) (citation omitted).

Under Minnesota Law, a plaintiff claiming fraud or intentional misrepresentation must establish:

> (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance.

*U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011).

Defendants argue that Plaintiffs fail to allege the "who, what, where, when, and how" of the alleged fraud. *See Joshi*, 441 F.3d at 556. The Court disagrees. Like Defendants' Rule 8 argument regarding group pleading, this contention focuses narrowly on the nine-paragraph fraud count while disregarding the detailed factual allegations set forth in the Complaint's broader factual background. When all the allegations are considered as a whole, Plaintiffs have pleaded their fraud claim with the requisite particularity. The Complaint identifies specific dates of allegedly fraudulent statements, the individuals who made them, and the circumstances under which they were made.

Rule 9(b) does not require plaintiffs to plead every detail of an alleged fraud; it requires only allegations sufficient to enable defendants to respond. *See Evangelical Lutheran Church in Am. Bd. of Pensions v. Spherion Pac. Workforce LLC*, Civ. No. 04-4791, 2005 WL 1041487, at *3 (D. Minn. May 4, 2005) (explaining that although some allegations "suffer[ed] from a lack of specification," the complaint, "analyzed as a whole, adequately puts [the defendant] on notice of the particular instances of misrepresentation"). At this stage of the proceedings, the Court is satisfied that Plaintiffs have met their pleading burden under Federal Rule of Civil Procedure 9(b).

## V.    RULE 12(B)(6)—FAILURE TO STATE A CLAIM

Plaintiffs bring eleven counts in its operative complaint: Count 1, misappropriation of trade secrets in violation of Minn. Stat. § 325C.01, *et seq.* and 18 U.S.C. § 1836, *et seq.*; Count 2, breach of contract; Count 3, breach of fiduciary duties; Count 4, breach of the covenant of good faith and fair dealing; Count 5, civil conspiracy; Count 6, conversion/civil theft; Count 7, unjust enrichment; Count 8, accounting; Count 9, tortious interference with prospective economic advantage and contract; Count 10, fraud; and Count 11, injunctive relief.

Defendants move to dismiss each of these claims for failure to state a claim on several different grounds. The Court will address each ground or count in turn.

### A.      Independent Duty Rule

Defendants argue that Plaintiffs' six tort claims are barred by the independent duty rule and should therefore be dismissed.[8]  The independent duty rule provides that a plaintiff cannot recover damages in tort for an alleged breach of contract except in "exceptional cases where the defendant's breach of contract constitutes or is accompanied by an independent tort."  *Wild v. Rarig*, 234 N.W.2d 775, 789 (Minn. 1975); *see also Hanks v. Hubbard Broad., Inc.,* 493 N.W.2d 302, 308 (Minn. Ct. App. 1992).  But the mere existence of a governing contract between the parties does not preempt or eliminate the possibility of a tort claim.  *AKA Distrib. Co. v. Whirlpool Corp.,* 137 F.3d 1083, 1086 (8th Cir. 1998).  If a tort claim is based on a breach of duty that "is indistinguishable from the breach of contract[,]" the tort claim will fail, but if "a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself," the tort claim is viable.  *Hanks,* 493 N.W.2d at 308 (citation omitted).  The Court will address the applicability of the independent duty rule to each of the claims challenged by Defendants.

**First**, Plaintiffs' claim for breach of fiduciary duty (Count 3) against the Individual Defendants is not barred by the independent duty rule because Plaintiffs base their

---

[8] According to Defendants, Plaintiffs' tort claims include Count 3, breach of fiduciary duties; Count 5, civil conspiracy; Count 6, conversion/civil theft; Count 7, unjust enrichment; Count 9, tortious interference with prospective economic advantage and contract; and Count 10, fraud.

breach of fiduciary duty claim on statutory and common law fiduciary duties, in addition to the fiduciary duty imposed by the Operating Agreement. (*See* Am. Compl. ¶ 137.) If the Plaintiffs based their fiduciary duty claim solely on the parties' Operating Agreement, the claim would be barred. But the Complaint does not rely exclusively on the Operating Agreement. It relies on statutory and common law duties. Under Minn. Stat. § 322C.0409, subds. 2–3, members of a limited liability company owe duties of loyalty and care to the company, and those statutory duties apply here because Fly Boatworks is organized as an LLC. The parties may also be bound by common law fiduciary obligations. *Cf. Berreman v. W. Pub. Co.*, 615 N.W.2d 362, 367 (Minn. Ct. App. 2000) ("At common law, the shareholders in a close corporation owe one another a fiduciary duty."). Where such fiduciary duties exist, an alleged breach is distinct from a breach of contract, and the independent duty rule does not apply. *See U.S. Bank Nat'l Ass'n v. San Antonio Cash Network*, 252 F. Supp. 3d 714, 721 (D. Minn. 2017) ("Where [fiduciary] duties exist, even if arising from a contract, an alleged breach of those duties is distinct from the [alleged] breach of contract, . . . and hence the independent-duty rule will not apply." (citations and internal quotation marks omitted)). Because Plaintiffs allege breaches of statutory and common law duties independent of the Operating Agreement, the Court declines to dismiss the fiduciary duty claim under the independent duty rule.

**Second**, the Court declines to dismiss Plaintiffs' civil conspiracy claim (Count 5) as barred by the independent duty rule. Although the parties do not substantively address

the independent duty rule's application to the civil conspiracy, courts have stated that because civil conspiracy is a theory of liability rather than a stand-alone cause of action, it must be supported by an underlying tort. *BitNile, Inc. v. Perrill*, Civ. No. 22-2911, 2023 WL 5723818, at *8 (D. Minn. Sept. 5, 2023). Because Plaintiffs allege an underlying tort (e.g., tortious interference) and Defendants have not shown that the independent duty rule bars Plaintiffs' civil conspiracy claim, the Court will not dismiss the civil conspiracy claim on the basis of the independent duty rule.

**Third**, the independent duty rule does not preclude Plaintiffs' conversion and civil theft claim (Count 6) because the Complaint alleges that Defendants owed fiduciary duties under Minnesota statutory and common law. *See Polaris Indus., Inc. v. Mangum*, 690 F. Supp. 3d 966, 975–76 (D. Minn. Sept. 7, 2023) (finding that conversion claim was not precluded by the independent duty rule because plaintiff pled a common law duty of confidentiality independent from the parties' contractual duties).

**Fourth**, although the parties do not meaningfully address whether the independent duty rule applies to unjust enrichment claims, the Court concludes that the rule does not bar Plaintiffs' unjust enrichment claim (Count 7). The independent duty rule bars **tort** claims when the tort claim is based on the same underlying conduct as the contract claim. *See id.* at 975. But unjust enrichment is an **equitable** claim, not a tort claim. *See, e.g.*, *United States v. Bame,* 721 F.3d 1025, 1030 (8th Cir. 2013). Moreover, under Minnesota law, unjust enrichment is not available where there is an express

-20-

contract between the parties, and the plaintiff has an adequate legal remedy. *Id.* Thus, if a contract does not exist, the independent duty rule is not implicated. Conversely, if a valid contract does exist, Plaintiffs' unjust enrichment claim fails on the merits. Stated differently, Plaintiffs' unjust enrichment claim is not barred by the independent duty rule because such claim necessarily rests on the absence of a contract. The Court therefore declines to dismiss the unjust enrichment claim as barred by the independent duty rule.

**Fifth** and **Sixth,** Plaintiffs' claims for tortious interference with prospective economic advantage and contract (Count 9) and fraud (Count 10) are also not barred by the independent duty rule. As previously discussed, Plaintiffs allege that Defendants owed fiduciary duties under Minnesota statutory and common law, which arise independently of any contract. Because these duties exist outside the contract, the independent duty rule does not apply. *See N. Cent. EMS Corp. v. Bound Tree Med., LLC*, Civ. No. 15-2793, 2016 WL 544472, at *6–7, 9 (D. Minn. Feb. 10, 2016) (dismissing tortious interference and fraud claims but only where defendant's duty arose out of contract).

In conclusion, the independent duty rule does not bar any of the claims challenged by Defendants at this stage.

### B.    Count 1: DTSA and MUTSA (All Defendants)

Defendants argue that Plaintiffs' trade secret claims must be dismissed. The federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the Minnesota Uniform Trade Secrets Act ("MUTSA"), Minn. Stat. § 325C.01 *et seq.*, each provide a private cause of action for misappropriation of trade secrets.

To prevail on a misappropriation of trade secrets claim under the DTSA or the MUTSA, the plaintiff must prove (1) the existence of a trade secret possessed by the plaintiff and (2) misappropriation of the trade secret by the defendant.[9]  18 U.S.C. § 1839; Minn. Stat. § 325C.01.  First, to allege the existence of a trade secret, the plaintiff must allege (1) it possessed information that derived independent economic value from its secrecy; (2) the information was not readily ascertainable by others; and (3) it took reasonable steps to keep the information secret.  18 U.S.C. § 1839(3); Minn. Stat. § 325C.01, subd. 5; *see also Protégé Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 938–39 (D. Minn. 2019).  Second, to allege misappropriation, the plaintiff must allege the defendant acquired, disclosed, or used a trade secret without the consent of its owner when the defendant either used improper means to acquire it or knew or should have known, at the time of disclosure or use, it had been acquired by improper means or from someone with a duty to maintain its secrecy.  18 U.S.C. § 1839(5); Minn. Stat. § 325C.01, subd. 3; *Protégé Biomedical*, 394 F. Supp. 3d at 939.   "Improper means" includes breaching or inducing a breach of a duty to maintain the trade secret's secrecy.  18 U.S.C. § 1839(6); Minn. Stat. § 325C.01, subd. 2.[10]

---

[9] Under the DTSA, the plaintiff must also establish that the trade secret was used in or intended for use in interstate or foreign commerce.  18 U.S.C. § 1836(b)(1).

[10] Because the MUTSA and the DTSA are materially similar, courts routinely analyze such claims together.  *See, e.g.*, *Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 967 (D. Minn. 2018).

The issue presented by Defendants' motion concerns the first requirement—the existence of a trade secret.  Defendants argue that the Complaint fails to allege the existence of a trade secret for essentially two reasons.  First, the Complaint fails to allege that Plaintiffs took reasonable efforts maintain secrecy of the alleged trade secrets.[11] Second, Defendants argue that Plaintiffs' alleged trade secrets fail to differentiate between features that were state of art in existing designs and those that Fly Boatworks added and now claim as "trade secrets."  The Court will address each argument in turn.

### 1.    Existence of Trade Secrets

"Reasonable efforts to maintain secrecy need not be overly extravagant, and absolute secrecy is not required."  *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 974 (8th Cir. 2011).  Confidentiality agreements and annual affirmance of confidentiality agreements are likely reasonable efforts, *see Prime Therapeutics LLC v. Beatty*, 354 F. Supp. 3d 957, 968 (D. Minn. 2018), while a failure to disseminate materials on a need-to-know basis with requirements that the information be kept confidential fails

---

[11] Defendants argue that fiduciary duties alone cannot create trade secrets.  But that argument overlooks Plaintiffs' allegations that they took reasonable steps to maintain the secrecy of the information at issue.  To be sure, "employees have a common law duty not to use trade secrets or confidential information obtained from their employer."  *Eaton Corp. v. Appliance Valves Corp.*, 971 F.2d 136, 141 (8th Cir. 1992).  That principle also aligns with this Court's prior observation that, "in a closely held company with only five members, reliance on only fiduciary duties to preserve confidential information would be reasonable."  *Gilk*, 2025 WL 1920496, at *5.

the reasonable efforts standard, *see Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 396 (D. Minn. 2020).

The Court concludes that Plaintiffs have done enough to show at this early stage that they took reasonable steps to maintain secrecy such that they plausibly allege that the Skiff Innovations qualify as trade secrets. Plaintiffs' disclosure to Martac does not defeat its trade secrets claim because Fly Boatworks' disclosures were likely in furtherance of applying the trade secret to its intended use. *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974) ("[S]ecrecy is not lost, however, if the holder of the trade secret reveals the trade secret to another in confidence . . . . in order to apply [the trade secret] to the uses for which it is intended." (citation and internal quotation marks omitted)). If Fly Boatworks wanted to market the Skiff Innovations, it is reasonable to assume that it would need to disclose the information to potential partners, such as Martac.

Nor does Plaintiffs' disclosure of the information to industry expert Chris Morejohn for the purpose of obtaining feedback, by itself, defeat their trade-secret claim, because it appears that the information was shared in confidence. *See id.* After Daniel Gilk discussed the Skiff Innovations with Chris Morejohn, Morejohn wrote "I just want to say here in writing all that you shared with me will not be shown to anyone else unless you say it's ok." (Suppl. D. Gilk Decl. ¶ 13, Ex. GG at 1, June 10, 2025, Docket No. 43.) Morejohn's email supports the inference that when the Gilks spoke to outsiders about

-24-

confidential information they did so with the understanding that the information would be kept confidential.[12]

Accordingly, the Court concludes that Plaintiffs have plausibly alleged the existence of trade secrets.

### 2. Description of Trade Secrets

Defendants also argue that the Complaint fails to allege the existence of a trade secret because, they assert, Plaintiffs have failed to adequately describe their trade secrets. Defendants argue that Plaintiffs' alleged trade secrets fail to differentiate between features that were already state-of-the-art and those that Fly Boatworks added and now claim as "trade secrets."

Because of the sensitive nature of the alleged trade secret information underlying the claims, a plaintiff need not "identify [its] trade secrets with specificity in the . . .

---

[12] Defendants argue that Plaintiffs fail to allege a trade secret because the skiff "marketplace is a 'knock off' marketplace." (*See* Defs.' Mem. Supp. Mot. to Dismiss at 10, June 24, 2025, Docket No. 55 (quoting *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 689 (D. Minn. 1986).) It is true that assets are not afforded trade secret status when they can be easily reversed engineered. *See Kewanee Oil*, 416 U.S. at 475 ("A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.") The Complaint, however, suggests that the skiff market is not a "knock off" marketplace. The Complaint alleges that despite working with Martec on behalf of Axocon, Fisher continued to seek the Gilks' engineering services to improve the M18. (Am. Comp. ¶ 59.) The fact that Fisher cannot reverse engineer Gilks' designs supports the inference that the skiff market is not a "knock off" marketplace. Indeed, Chris Morejohn, who Defendants argue created the skiff that the Gilks copied, acknowledged that the Gilks were doing something new. (Suppl. D. Gilk Decl. ¶ 13, Ex. GG at 2 ("What you have done is what I [Chris Morejohn] have been hoping for in sharing my designs and ideas online, something new.").)

Complaint." *Deluxe Fin. Servs., LLC v. Shaw,* Civ. No. 16-3065, 2017 WL 3327570, at *4 n.3 (D. Minn. Aug. 3, 2017).  Indeed, to do so would "paradoxically jeopardize" the plaintiff's ability to protect its trade secrets.  *Id.*  At the same time, as with any claim, the plaintiff "cannot rely on conclusory statements that simply repeat the elements of its claim; the plaintiff must disclose sufficient information to infer more than a mere possibility of misconduct."  *TE Connectivity Networks, Inc. v. All Sys. Broadband, Inc.*, Civ. No. 13-1356, 2013 WL 6827348, at *3 (D. Minn. Dec. 26, 2013).

The Court concludes that Plaintiffs have more than adequately described their alleged trade secrets to survive a motion to dismiss.  For example, Paragraph 19 of the Complaint lists and describes four "critical innovations" that were incorporated into the F2 Carbon.  Read in conjunction with the rest of the Complaint, these allegations are sufficient to place Defendants on notice of the basis for Plaintiffs' claim that the information taken qualified as trade secrets.  The Court expects that the contours of Plaintiffs' alleged trade secrets will be fleshed out after discovery.  *SL Montevideo Tech., Inc. v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1179 (D. Minn. 2003) (acknowledging that "[t]he exact nature of the trade secret is a matter for discovery").

Accordingly, the Court concludes that Plaintiffs have plausibly alleged the existence of trade secrets and have described them sufficiently to survive a motion to dismiss.

### C.    MUTSA Displacement

Defendants contend that Plaintiffs' non-MUTSA claims (Counts 2–7, 9–10) must be dismissed because they are displaced by MUTSA.  The MUTSA "displace[s] conflicting tort, restitutionary, and other law of [the] state providing civil remedies for misappropriation of a trade secret."  Minn. Stat. § 325C.07(a).  However, the MUTSA does not affect contractual remedies or civil remedies that are not based upon misappropriation of a trade secret.  *Id.* § 325C.07(b).  Thus, a plaintiff may "maintain separate causes of action 'to the extent that the causes of action have "more" to their factual allegations than the mere misuse or misappropriation of trade secrets.'"  *SL Montevideo Tech.*, 292 F. Supp. 2d at 1179 (quoting *Micro Display Sys., Inc. v. Axtel, Inc.*, 699 F. Supp. 202, 205 (D. Minn. 1988)).  The Court will address each claim in turn.

**Breach of Contract (Count 2)**.  MUTSA does not displace Plaintiffs' breach of contract claim for two reasons.  First, MUTSA does not affect **contractual** remedies.  *See* Minn. Stat. § 325C.07(b)(1).  Second, the Complaint contains "more" to their factual allegations than simply misappropriation of trade secrets.  Specifically, the Complaint alleges that the Individual Defendants (1) usurped Fly Boatworks' opportunities, (2) used assets (including, but not limited to trade secrets) for Axocon's benefit, (3) commingled Fly Boatworks' property, (4) acted on behalf of entities adverse to Fly Boatworks, (5) competed with Fly Boatworks, (6) failed to discharge their duties in good faith, (7) impaired Fly Boatworks' business operations, and (8) executed contracts without Plaintiffs' knowledge.  (Am. Comp. ¶ 133.)  Because Count 2 is grounded in contract and

rests on allegations that go beyond the alleged theft of trade secrets, Count 2 is not displaced.

**Breach of Fiduciary Duty (Count 3) and Civil Conspiracy (Count 5)**.  The Court concludes that Plaintiffs' claims for breach of fiduciary duty and civil conspiracy[13] are displaced only to the extent they are based on misappropriation of trade secrets.  The Complaint contains "more" to the factual allegations than mere misappropriation of trade secrets.  Like the breach of contract claim, the Complaint alleges that the Individual Defendants (1) usurped Fly Boatworks' opportunities, (2) used assets (including, but not limited to trade secrets) for Axocon's benefit, (3) commingled Fly Boatworks' property, (4) acted on behalf of entities adverse to Fly Boatworks, (5) competed with Fly Boatworks, (6) failed to discharge their duties in good faith, (7) impaired Fly Boatworks' business operations, (8) made unlawful capital calls and unlawfully called loans, and (9) executed contracts without Plaintiffs' knowledge.  (Am. Comp. ¶¶ 140, 155.)

**Breach of Covenant of Good Faith and Fair Dealing (Count 4)**.  Plaintiffs' claim for breach of the covenant of good faith and fair dealing is claim is not displaced because it is grounded in parties' contract, namely the Operating Agreement (Am. Compl. ¶ 145),

---

[13] To demonstrate a civil conspiracy, a plaintiff must demonstrate that the defendants "agreed to accomplish an unlawful purpose, and took concerted actions to achieve that purpose."  *Marty H. Segelbaum, Inc. v. MW Cap., LLC*, 673 F. Supp. 2d 875, 880–81 (D. Minn. 2009) (citing *Harding v. Ohio Cas. Ins. Co.,* 41 N.W.2d 818, 824 (Minn. 1950)).  Additionally, the defendants' actions must be based on an underlying intentional tort. *Id.*  Because some of Plaintiffs' tort claims survive, this claim also survives, except to the extent it is displaced under MUTSA.

and MUTSA does not affect contractual remedies.  Minn. Stat. § 325C.07(b)(1).  Count 4 is therefore not displaced by MUTSA.

**Conversion/Civil Theft (Count 6)**.  Count 6 is displaced in part.  The Complaint contains "more" to the factual allegations than mere misappropriation of trade secrets. The Complaint specifically alleges that Defendants converted, in addition to trade secrets, "money, property, assets, . . . and funds" that belong to Fly Boatworks.  (Am. Comp. ¶ 161.)  The Court therefore concludes that this claim is displaced only to the extent it is based on misappropriation of trade secrets.  However, for the reasons set forth below, Plaintiffs fail to plausibly allege claims for conversion and civil theft.  As a result, Count 6 will be dismissed in full.

**Unjust Enrichment (Count 7)**.  The Court concludes that Plaintiffs' unjust enrichment claim is displaced only to the extent it is based on the misappropriation of trade secrets.  Although the basis on which Plaintiffs rest their unjust enrichment claim is not entirely clear, it is clear—when reading the Complaint as a whole—that Plaintiffs' unjust enrichment claims is based on "more" than mere trade secret misappropriation. Notably, the unjust enrichment count does not reference "trade secrets" at all.  (*See* Am. Compl. ¶¶ 167–172.)  Accordingly, the Court finds that the unjust enrichment claim is displaced only insofar as it relies on the alleged misappropriation of trade secrets.

**Tortious Interference (Count 9)**.  The Complaint contains "more" to the factual allegations than mere misappropriation of trade secrets as it alleges that Defendants

interfered with Plaintiffs' reasonable expectation of economic advantage and contract by creating competing companies and usurping Fly Boatworks' business opportunities by diverting such opportunities "to Axocon, MASC, and other unknown entities." (Am. Comp. ¶ 179.) Count 9 is therefore displaced only to the extent it is based on misappropriation of trade secrets.

**Fraud (Count 10)**. Plaintiffs' fraud claim is displaced only to the extent it is based on misappropriation of trade secrets because the Complaint alleges "more" than simply trade secret misappropriation. Plaintiffs base their fraud claim on Defendants' "false representations of material fact when they represented to the Gilks that the parties would share all profits derived from the Gilks' invention, design, development, and innovations related to the F2 Carbon and M18" as well as Defendants' continued false representations that they were negotiating with Martac and Indoor Labs on Fly Boatworks' behalf. (Am. Comp. ¶¶ 185–86.) Therefore, the fraud claim is displaced only to the extent it is based on misappropriation of trade secrets.

In sum, MUTSA displaces claims to the extent they are based on misappropriation of trade secrets. MUTSA does not affect contractual remedies. Under MUTSA, Plaintiffs' claims for breach of contract and breach of the covenant of good faith and fair dealing are not displaced by MUTSA because those claims are grounded in contract. Plaintiffs' claims for breach of fiduciary duties, civil conspiracy, conversion/civil theft, unjust

-30-

enrichment, tortious interference, and fraud are displaced only to the extent they are based on theft of trade secrets.

### D.      Count 6: Conversion/Civil Theft

Plaintiffs base their conversion/civil theft claim on the Defendants' unlawful taking of Plaintiffs' "money, property, assets, trade secrets, and funds." (Am. Comp. ¶¶ 160–62.) Defendants argue that Plaintiffs' claim for conversion/civil theft should be dismissed because (1) the Complaint fails to identify the converted property; (2) the Complaint fails to plead the deprivation element; (3) MUTSA displaces the conversion/civil theft claim; (4) the Complaint fails to identify specific stolen funds; (5) the Complaint fails to plead an initial wrongful taking; and (6) the conversion was not "surreptitious" because the Defendants, three of five of Fly Boatworks' members, knew about the taking. After careful consideration, the Court concludes that Plaintiffs fail to plausibly allege conversion and civil theft and will dismiss those claims.

### 1.      Conversion

Conversion is "an act of willful interference with [the personal property of another], done, without lawful justification, by which any person entitled thereto is deprived of use and possession, and the exercise of dominion and control over goods inconsistent with, and in repudiation of, the owner's rights in those goods." *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 585 (Minn. 2003) (citation modified). The elements of common law conversion are: "(1) plaintiff holds a property interest; and (2) defendant

deprives plaintiff of that interest." *Williamson v. Prasciunas*, 661 N.W.2d 645, 649 (Minn. Ct. App. 2003).

The Court concludes that Plaintiffs' conversion claim fails on several fronts. **First**, to the extent the claim is based on theft of trade secrets, the claim fails because (1) the claim is displaced under MUTSA, Minn. Stat. § 325C.07(a), and (2) under Minnesota law, trade secrets are not subject to conversion, *Jacobs v. Gradient Ins. Brokerage, Inc.*, Civ. No. 15-3820, 2016 WL 1180182, at *3 (D. Minn. Mar. 25, 2016). **Second**, to the extent the claim is based on the alleged theft of "money" or "funds," it fails because Minnesota does not appear to recognize a conversion claim for money unless the funds are specific and identifiable. *RSS Fridley, LLC v. Nw. Orthopaedic Surgeons P'ship, LLP*, No. A21-664, 2022 WL 200359, at *12 (Minn. Ct. App. Jan. 24, 2022) (indicating that conversion applies only to tangible property, and that money—being intangible—is not subject to conversion unless it is "specific and capable of identification"). Plaintiffs respond that the money is sufficiently identifiable, relying on Fisher's financial estimates of the profits Fly Boatworks expected to receive from skiff sales. But the Court concludes that these funds are not sufficiently specific and identifiable as they are merely a projection of future profit. *TCI Bus. Cap., Inc v. Five Star Am. Die Casting, LLC*, 890 N.W.2d 423, 429 (Minn. Ct. App. 2017) ("[A] conversion claim is viable with respect to money only if the money is in a tangible form (such as a particular roll of coins or a particular stack of bills) and is kept separate from other money."). **Third**, to the extent Plaintiffs' conversion claim is based on

Defendants' conversion of Plaintiffs' "assets" (Am. Comp. ¶¶ 160–62), the allegation is vague and conclusory, and thus insufficient to survive a motion to dismiss.

### 2. Civil Theft

Minnesota's civil theft statute provides that "[a] person who steals personal property from another is civilly liable to the owner of the property for its value when stolen plus punitive damages of either $50 or up to 100 percent of its value when stolen, whichever is greater."  Minn. Stat. § 604.14, subd. 1.  Minnesota courts have interpreted the word "steal" to mean "that a person wrongfully and surreptitiously takes another person's property for the purpose of keeping it or using it."  *Staffing Specifix, Inc. TempWorks Mgmt. Servs. Inc.*, 896 N.W.2d 115, 126  (Minn. Ct. App. 2017) (quoting *TCI Bus. Cap.*, 890 N.W.2d at 431.  "This definition makes clear that for a person to steal something, there must be some **initial** wrongful act in taking possession of the property."  *Id.* (emphasis added).  In contrast to conversion, "federal courts in Minnesota routinely permit intangible funds to support claims of civil theft."  *De Castro v. Castro*, Civ. No. 18-1449, 2018 WL 6026089, at *4 (D. Minn. Nov. 16, 2018).

Although civil theft is broader than the tort of conversion in that theft of funds may support a civil theft claim, there must an "initial wrongful act in taking possession of the property."  *Staffing Specifix*, 896 N.W.2d at 126.  The Complaint fails to allege an "initial wrongful act" because the Defendants, as co-owners of Fly Boatworks, lawfully possessed the allegedly stolen property before any wrongful acts occurred.  *See Hajiabdi v. Metro. Transp. Network, Inc.*, Civ. No. 21-268, 2021 WL 5177413, at *5 (D. Minn. Nov. 8, 2021).

-33-

Because the Complaint fails to plausibly allege an initial wrongful act in taking possession of the property, Court will dismiss the civil theft claim.

Accordingly, Plaintiffs fail to plausibly state a claim for conversion and civil theft under Minn. Stat. § 604.14.  The Court will therefore dismiss Count 6 for failure to state a claim.

### E.    Count 7: Unjust Enrichment

Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because under Minnesota law, unjust enrichment is not available where there is an express contract between the parties and the plaintiff has "an adequate legal remedy[.]" *Bame,* 721 F.3d at 1030; *Sterling Cap. Advisors, Inc. v. Herzog*, 575 N.W.2d 121, 126 (Minn. Ct. App. 1998).   Defendants argue that Plaintiffs' unjust enrichment claim should be dismissed because they have an adequate legal remedy by way of their claims for breach of contract and trade secret misappropriation under the DTSA and the MUTSA.

The Court concludes that Defendants' argument that Plaintiffs' unjust enrichment claim should be dismissed is premature.  *See Masterson Pers., Inc. v. The McClatchy Co.*, Civ. No. 05-1274, 2005 WL 3132349, at *7 (D. Minn. Nov. 22, 2005) (noting that when an unjust enrichment claim is pleaded in the alternative to a breach of contract claim, dismissal "is not appropriate at this early stage of the case").   Federal Rule of Civil Procedure 8(d)(2) permits a party to "plead alternative theories of relief under both legal and equitable grounds."  *LePage v. Blue Cross & Blue Shield of Minn.*, Civ. No. 08-584, 2008 WL 2570815, at *8 (D. Minn. June 25, 2008).   Even though Plaintiffs cannot "obtain

double recovery," they are permitted to pursue multiple alternative theories of relief, including claims under statute, breach of contract, and unjust enrichment. *Id.* Because Plaintiffs have properly pled their unjust enrichment claim in the alternative, the Court declines to dismiss this claim at this time. The Court will, however, dismiss the claim to the extent the claim is based on misappropriation of trade secrets, as discussed above.

### F.     Counts 8 and 11: Accounting and Injunctive Relief

Defendants seek dismissal of Plaintiffs' claims for injunctive relief and accounting on the grounds that these counts are remedies, not independent causes of action. The Court agrees. *See Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1014 (D. Minn. 2008) (dismissing claims for declaratory relief, injunctive relief, and an accounting because they were "merely remedies, not separate causes of action"). That said, Plaintiffs may pursue these remedies in connection with the other claims set forth in the Complaint.

### G.     Damages

Defendants argue that the Complaint fails to allege damages as to its conversion and tortious interference claims (Counts 6 and 9). Because the Court will dismiss the conversion claim for failure to state a claim (as discussed above), it need not address whether the Complaint pleads damages with respect to that claim. The Court will, however, address whether Plaintiffs plausibly allege damages as to their tortious interference claims.

Under Minnesota law, to state a claim for tortious interference with a contract or prospective economic advantage, the plaintiff must allege damages—among other things. *N. PCS Servs., LLC v. Sprint Nextel Corp.*, Civ. No. 05-2744, 2006 WL 1072075, at *3 (D. Minn. Apr. 21, 2006) (listing elements for tortious interference with contractual relationship); *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) (listing elements for tortious interference with prospective economic advantage).

At this early stage of the litigation, the Court is satisfied that Plaintiffs have met their pleading burden with respect to the damages element.  Plaintiffs allege that Fisher estimated that the partnership between Fly Boatworks and Martac would generate $45.9 million of revenue and $23 million of profits per year.  (Am. Comp. ¶¶ 48–52.)  Plaintiffs also detail how Fisher created another entity, MASC, to secure a manufacturing contract with Martac, thereby cutting Fly Boatworks out of the deal.  (Am. Comp. ¶ 61.)  Based on these allegations, as well as those detailed elsewhere in the Complaint, the Court finds that Plaintiffs have plausibly alleged damages for their tortious interference claims.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss Plaintiffs' First Amended

Complaint (Docket No. [53]) is **GRANTED in part and DENIED in part**, as follows with respect to each Count of Plaintiffs' Amended Complaint:

1. Count 1: DTSA (18 U.S.C. § 1836, *et seq.*) and MUTSA (Minn. Stat. § 325C.01, *et. seq.*) – **DENIED**;

2. Count 2: Breach of Contract – **DENIED**;

3. Count 3: Breach of Fiduciary Duties – **DENIED**, except to the extent such claim based on the misappropriation of trade secrets;

4. Count 4: Breach of the Covenant of Good Faith and Fair Dealing – **DENIED**;

5. Count 5: Civil Conspiracy – **DENIED**, except to the extent such claim is based on the misappropriation of trade secrets;

6. Count 6: Conversion/Civil Theft – **GRANTED**;

7. Count 7: Unjust Enrichment – **DENIED**, except to the extent such claim is based on the misappropriation of trade secrets;

8. Count 8: Accounting – **GRANTED**, but Plaintiffs may pursue this remedy in connection with other claims set forth in the Complaint;

9. Count 9: Tortious Interference with Prospective Economic Advantage and Contract – **DENIED**, except to the extent such claim is based on the misappropriation of trade secrets;

10. Count 10: Fraud – **DENIED**, except to the extent such claim is based on the misappropriation of trade secrets;

11. Count 11: Injunctive Relief – **GRANTED**, but Plaintiffs may pursue this remedy in connection with other claims set forth in the Complaint; and

12. Defendants' request for further briefing on Rule 23.1's requirements is **DENIED without prejudice**.


DATED:  March 31, 2026                              _____/s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                     United States District Judge